# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| **JAMES F. GERDING,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **vs.** | )     **Case number 4:04cv0803 CAS** |
| | )                     **TCM** |
| **MIKE KEMNA and** | ) |
| **JEREMIAH W. NIXON,[1]** | ) |
| | ) |
| **Respondents.** | ) |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

The 28 U.S.C. § 2254 petition of James F. Gerding ("Petitioner"), a Missouri prisoner, for federal habeas corpus relief is before the undersigned United States Magistrate Judge for a review and a recommended disposition. See 28 U.S.C. § 636(b).

### Background

Petitioner's wife, Evelyn Gerding, died on November 20, 1995, after falling or jumping from the truck in which she was riding with Petitioner. (Resp. Ex. 15 at 2.) The couple had spent the evening at two bars and a casino, and had argued in the truck. (Id.) Based on his statements to police officers, Petitioner was charged with second degree

---

[1]Because Petitioner is challenging a sentence to be served in the future, the Attorney General of Missouri, Jeremiah W. Nixon, is added as a proper party respondent. See Rule 2(b), Rules Governing Section 2254.

murder for causing her death "by striking her about the head with a blunt instrument."[2] (Resp. Ex. 9 at 10.)

Prior to trial, Petitioner moved to suppress those statements. (Id. at 28-30.) Evidence and arguments on the motion were heard on November 5, 1996. (Id. at 40.) David Curtis, a detective with the St. Charles County Sheriff's Office, testified that he and Lieutenant Simcox, also with the Sheriff's Office, interviewed Petitioner after he had been taken to the jail. (Resp. Ex. 1 at 37-40.) Before beginning the interview, Lieutenant Simcox read Petitioner his Miranda[3] rights, following which Petitioner indicated that he was willing to talk with the officers. (Id. at 41.) The officers asked him what had happened. (Id. at 42.) Petitioner explained that, after having a few drinks at home, he and his wife went to two bars and a casino. (Id. at 42-43.) On the way home, they argued; she tried to get out of the truck when it was going thirty to forty miles an hour. (Id. at 43.) He tried to stop her by grabbing her arm, but she fell out. (Id.) He stopped the car, went back, and found her lying in a ditch. (Id.) A tape-recording of the conversation was played. (Id. at 44.)

Curtis saw Petitioner again when Petitioner took him and another detective to the scene and showed them where he had struck his wife. (Id. at 45.) Curtis also testified that Petitioner did not say anything to him about having been drinking and he (Curtis) did not

---

[2]A charge of armed criminal action and of driving while intoxicated were later added. (Id. at 13-14; Resp. Ex. 3 at 7-8; Resp. Ex. 10 at 11-12.)

[3]Miranda v. Arizona, 384 U.S. 436 (1966).

notice any intoxication, including Petitioner being unsteady on his feet or having a strong odor of alcohol.  (Id. at 46, 48.)  Although Petitioner's eyes were red and his speech slow, those traits could have been caused by the time of the morning – after two o'clock – or by crying.  (Id. at 46, 47, 48.)

Simcox also testified about advising Petitioner of his Miranda rights before questioning him and about Petitioner's description of that evening's events.  (Id. at 53-56, 60.)  He testified that it was obvious that Petitioner had been drinking: he smelled of alcohol; his eyes were bloodshot; and his clothes were in disarray.  (Id. at 57-58.)  Petitioner appeared upset, but not in any medical distress.  (Id. at 58.)

At approximately five o'clock that afternoon, another officer with the Sheriff's Office, Kevin Wilson, interviewed Petitioner after learning of the autopsy results on Mrs. Gerding.  (Id. at 73-74, 100.)  He first asked if Petitioner remembered his Miranda rights; Petitioner did.  (Id. at 74.)  Petitioner told Wilson he wished to discuss the incident.  (Id.)  Wilson told Petitioner that the autopsy results were inconsistent with Mrs. Gerding having fallen, jumped, or been pushed from the truck.  (Id. at 75.)  Wilson further told Petitioner that there were fractures to part of her face with no soft tissue over the injuries and that he (Wilson) felt these injuries were inconsistent with someone falling from a vehicle.  (Id.)  Petitioner's demeanor immediately changed from confident to nervous.  (Id. at 76.)  Petitioner stated that he had struck his wife "very hard" at least twice in the face with his fist after she struck him.  (Id. at 76, 78)  At one point, she was up against the passenger side door.  (Id. at 80.)  Petitioner noticed that the dome light had come on and tried to grab

her arm to keep her in the truck. (Id.) She either fell or jumped. (Id.) The truck was then going thirty to thirty-five miles an hour. (Id. at 81.) He backed up the truck and stopped it where she lay. (Id. at 81-82.) She was moving; he called for help. (Id.)

Wilson told Petitioner that the injuries to the back of Mrs. Gerding's head were inconsistent with his description of her falling. (Id. at 84.) He became "visibly shaken, agitated, [and] nervous[.]" (Id. at 84-85.) Petitioner stated that he had told his wife not to hit him and that he became very angry when she did. (Id. at 85-86.) When he found his wife on the side of the road, he turned her over to a face up position. (Id. at 86.) He told Wilson that he had struck her with an object when she was face down and had killed her. (Id. at 87.) He could not remember what he had hit her with or how many times. (Id. at 88.) Later in the interview, after being asked what he would say if Wilson told him someone had seen him strike his wife, Petitioner stated that he had picked up something – a solid object – by the side of the road, near her body, and struck her "more than once." (Id. at 90-91, 93.) He demonstrated his movements. (Id. at 90-91, 92.) He explained that he had been blinded by rage. (Id. at 91.) He stopped hitting her when he came to his senses. (Id. at 95.) He made a drawing of the object he used and wrote some descriptive adjectives on the drawing. (Id. at 93-94.) The object itself he threw to the west of his wife's body. (Id. at 95.) Wilson asked Petitioner to make a written statement; he did. (Id. at 95-96.) No changes were made to the statement by anyone other than Petitioner. (Id. at 114.) Wilson asked him to demonstrate at the scene what he had done; he did. (Id. at 97-98.) The object was not found. (Id. at 98.)

On cross-examination, Wilson testified that he had raised his voice at times during the interview. (Id. at 107.) He did not yell. (Id.) The other detective who was sometimes in the room, Detective Blankenship,[4] never kicked over a chair. (Id.) At one point, Petitioner suggested it might have been an umbrella that he used to hit his wife. (Id. at 111.) Wilson told him he did not think an umbrella would cause her skull fractures. (Id.) Petitioner voluntarily came up with another suggestion, and then made the drawing. (Id.) Wilson did not threaten Petitioner, nor did he know of anyone who did. (Id. at 114.)

Petitioner did not present any evidence in support of his motion, but did argue that (a) his initial arrest pursuant to a driving while intoxicated ("DWI") summons was unlawful and (b) his inculpatory statement was not freely and voluntarily given because it was obtained through trickery and third degree tactics. (Id. at 119, 120-25.)

Finding that Petitioner's statements included details that were not supplied by the officers and concluding that he was not subjected to an unreasonable or coercive interrogation, including the question about what Petitioner would say if he was told someone saw him hitting his wife, the court denied Petitioner's motion to suppress his statements.[5] (Id. at 128.)

---

[4]Walter Blankenship did not testify at the suppression hearing, but did testify at trial. (Resp. Ex. 5 at 371-406.) His involvement in Petitioner's interview was "slight." (Id. at 374.) He asked Petitioner two questions: how many times he had hit his wife in the truck and how many times when she was lying on the ground. (Id.)

[5]The Court also denied Petitioner's motion to suppress evidence, specifically, the results of the breathalyser test. That ruling is not at issue in these proceedings.

The Thursday before trial began, the court denied Petitioner's motion to sever the DWI charge.[6]  (Resp. Ex. 9 at 42.)  The Monday morning trial was to begin, Petitioner renewed his motion to sever; it was again denied.  (Resp. Ex. 3 at 9.)  Petitioner also moved for a continuance, arguing that jail records discovered on Friday that had been subpoenaed over the State's objection referred to a psychiatric history of Petitioner.  (Id. at 9-10.)  This late discovery raised the issue of Petitioner's competency, and trial counsel wanted to have him evaluated.  (Id. at 10.)  Trial counsel also informed the court that he had discussed with his client any history of mental illness or lack of capacity and had been told that his client did not want him to file a motion for a psychiatric evaluation.  (Id. at 11.)  Regardless, trial counsel thought the issue of his client's capacity at the time of his statements was important and wanted a continuance.  (Id.)  His request was denied.  (Id. at 14.)

Prior to the first witness testifying, the question of the photograph that would be shown the witness arose.  (Id. at 43-46.)  The first witness was Mrs. Gerding's sister and would be called to identify her.  (Id. at 44.)  The photograph was one taken in the autopsy room and revealed no intimate part of her body.  (Id. at 44-45.)  The prosecutor told the court that it was the least offensive.  (Id. at 45.)  It was allowed.  (Id. at 46.)  Mrs. Gerding's sister identified the photograph as being that of her sister.  (Id. at 49-50.)

In addition to testimony by members of the Sheriff's Office who had interviewed Petitioner or had investigated the scene and by citizens who had come upon the scene,

---

[6]See note 2, supra.

Mary Case, M.D., also testified on behalf of the State. (Resp. Ex. 5 at 475-552.) In addition to being an associate professor of pathology at St. Louis University, Dr. Case served as the chief medical examiner for four counties, including St. Charles County. (Id. at 477.) She was board certified in anatomical pathology, neuropathology, and forensic pathology. (Id. at 480.) Less than ten people in the country have a dual certification in forensic pathology and neuropathology. (Id. at 484.) The board certification required a training period and an examination ranging from one and one-half days to three days. (Id. at 480-81.) Asked about the certification in forensic pathology by the American Board of Forensic Examiners, Dr. Case replied that the board was an organization based in Branson, Missouri, and would certify someone for a fee, $1,000.00, and passing an examination of twenty questions about ethics. (Id. at 481-82.) The organization was not recognized by the National Association of Medical Examiners. (Id. at 482.) Dr. Case was on an editorial review board for a professional journal, had attended various workshops, including one on head injuries, and had published articles, abstracts, papers, and book chapters. (Id. at 486-90.) One abstract she wrote was on contrecoup injuries, the type of head injuries that occurs when a person falls down. (Id. at 491.) One book chapter she wrote was on head injuries. (Id. at 493.) And, she lectures on blunt trauma. (Id. at 494-95.) She had performed approximately 9,000 autopsies since graduating from medical school. (Id. at 498.)

After describing her autopsy of Mrs. Gerding and identifying various photographs, Dr. Case testified that her injuries were not consistent with injuries someone would sustain

from falling out of moving vehicle going thirty to forty miles an hour.  (Id. at 499-506, 512.)  The injuries were typical of someone who had been struck multiple times with a linear blunt object and whose skull had therefore been fragmented.  (Id. at 512.)  Mrs. Gerding had injuries to the entire circumference of her head, and there was no reason to believe that any of those injuries were sustained in a motor vehicle accident.  (Id. at 512-13.)  Additionally, Mrs. Gerding had broken back ribs consistent with striking of the body with blunt force and an abrasion along the midline of her back.  (Id. at 516-17.)  Her death was caused by being struck in her head by a blunt object.  (Id. at 521.)  And, her blood alcohol level was very high, so high that some people with that level would be unconscious.  (Id. at 522.)

Rickey Luetkenhaus, an officer with the Sheriff's Office, was the first witness to testify on behalf of Petitioner.  (Id. at 573.)  He had also testified for the State.  When called by the Petitioner, he testified that a glass was shown in a photograph of Petitioner's truck.  (Id. at 574.)  He also testified that his original report indicated that there was a plastic glass on the passenger's side.  (Id. at 575-76.)

Harry William Parks, M.D., was board certified by the American Board of Pathology, the American Board of Nuclear Medicine, the American Board of Forensic Examiners, and the American Board of Forensic Medicine.  (Resp. Ex. 7[7] at 588-89.)  He had performed autopsies for various counties in Illinois, where he was licensed, for the past twenty-five years.  (Id. at 592.)  He was a member of several professional associations

[7]Respondent's exhibit seven is volume four of the trial transcript; exhibit six is volume five.

and was listed as an expert in forensic pathology in a three-volume treatise published in 1978.  (Id. at 593, 594.)  The court ruled that he may testify as an expert witness.  (Id. at 595.)

After reviewing Mrs. Gerding's autopsy report, the autopsy notes, and the photographs, Dr. Parks concluded that her injuries, outlined in detail, were consistent with falling out of a moving motor vehicle and striking the pavement.  (Id. at 598-604.)  He had last published an article in 1989, and had not published anything on blunt trauma, automobile accidents, or neuropathology.  (Id. at 608.)  On cross-examination, he was asked if he expected that being kicked in the back with a specific pair of shoes would leave a mark.  (Id. at 644.)  Trial counsel objected on the grounds that there was no evidence that anyone was kicked in the back.  (Id.)  The prosecutor replied that Dr. Case had testified that the broken bones in Mrs. Gerding's back were consistent with someone being kicked.  (Id.)  Trial counsel disagreed.  (Id.)  The court allowed the question.  (Id.)  Dr. Parks opined that being kicked would not leave a bruise through the two or three layers of clothing and that the rib fractures were not consistent with someone being kicked by the shoes, depending on the force used.  (Id. at 645.)

At the conclusion of Dr. Parks' testimony, trial counsel moved for a mistrial on the grounds that the prosecutor referred to Mrs. Gerding being stomped or kicked in the back and there was no evidence of such.  (Id. at 671.)  He explained that he had been alert for such testimony because Dr. Case had concluded so in her deposition.  (Id. at 671-72.)  The prosecutor remembered that Dr. Case had testified that the rib fractures could have been

caused by kicking. (Id. at 672.) The court also thought there had been such testimony, and directed the court reporter to check for such. (Id.) A corrective jury instruction was contemplated. (Id.)

Petitioner was the next to testify. (Id. at 674.) He described the events of November 20, 1995, how his wife fell out of the car, and how he found her and tried to help. (Id. at 676-89.) He did not hit her after she fell. (Id. at 691.) When interviewed by Wilson the following afternoon, he had only boxer shorts and socks to wear[8] and had not had anything to eat or drink, with the exception of a soda. (Id. at 695-97.) Nor had he been advised of his constitutional rights. (Id. at 696.) At that time, he had been up for thirty-five hours. (Id. at 697.) He told Wilson what had happened. (Id. at 698.) Wilson started disagreeing with him and yelling at him. (Id.) Wilson left and Blankenship came in. (Id.) Blankenship then started contradicting him. (Id. at 699.) When Petitioner told him he wanted to listen to the tape-recording of his earlier statement, Blankenship became angry and left. (Id.) Wilson returned and suggested that Petitioner come with them to the scene. (Id. at 701.) At the scene, handcuffed and shackled, Petitioner did not demonstrate hitting his wife or throwing an object. (Id. at 702.) Back again at the interrogation room, Petitioner was placed in a corner facing a mirror. (Id.) He would describe what happened; Wilson and Blankenship would tell him it had not happened that way and would describe a different scenario. (Id. at 702-03.) They yelled at him, tried to

---

[8]On cross-examination, Petitioner confirmed that he had been placed on suicide watch. (Id. at 718.)

intimidate him, got close to him physically, and gave him hypothetical questions or implied that they knew what had happened. (Id. at 704.) He insisted he did not carry anything; Wilson asked him to draw what he would have carried if he had been. (Id. at 705-06.) He wrote things in his statement that were not true, e.g., that he believed he struck his wife again, because he was tired and wanted the questioning to end. (Id. at 707.) Most of the statement was dictated to him by Wilson. (Id. at 708.) When he did not write everything Wilson told him to, Wilson left and Simcox came in, kicked the chair, slammed his fist on the table, and told him they had enough evidence to charge him with first degree murder. (Id. at 708-09.)

Petitioner did not dispute on cross-examination that he had been given his rights four separate times within a short period of time. (Id. at 725-26.) At the request of the prosecutor, he read his statement, including the part where he struck his wife with an object found nearby as she lay face down. (Id. at 752-53.)

Before closing arguments, the trial court informed the attorneys that a review of the transcript had revealed no reference by Dr. Case to "kicking, kick or anything like that." (Resp. Ex. 6 at 782.) Trial counsel's request for a mistrial was denied on the grounds that both expert witnesses referred to blunt trauma, "which kicking would be an example of," and that it was not prejudicial in light of the testimony about how the injuries were caused. (Id. at 782-83.) However, the prosecutor was prohibited from making a reference to any kicking of Mrs. Gerding during closing argument. (Id. at 783.)

The jury returned a verdict of guilty of second degree murder, with a twenty-year term of imprisonment; guilty of armed criminal action, with a fifteen-year term of imprisonment; and guilty of driving while intoxicated, with a six-month term of imprisonment and a fine. (Id. at 845-46.) The first two sentences were ordered to be served consecutively; the last was to be served concurrently to the first. (Resp. Ex. 8 at 70.)

Petitioner appealed, arguing that (a) his due process rights were violated when the trial court denied him a continuance based on the prosecution's failure to disclose evidence of his mental condition when he confessed; (b) his Fifth Amendment and due process rights were violated when the trial court denied his motion to suppress his statements; (c) his rights to due process and a fair trial were violated when the trial court failed to instruct the jury on the lesser-included offense of involuntary manslaughter; (d) his motion to sever should have been granted; (e) his due process rights were violated when the trial court overruled his objection to the admission of an enlarged, full-color autopsy photograph of his wife's body; and (f) his rights to due process and a fair trial were violated when the trial court overruled his objection to the prosecutor's statement that the medical examiner's findings were consistent with his wife being kicked in the back and when the trial court denied his motion for a mistrial based on the erroneous statement. (Resp. Ex. 11 at 34-39.)

Noting that he had not challenged the sufficiency of the evidence, the appellate court first addressed Petitioner's claim that the trial court had erred in denying him a continuance.

> The trial court has tremendous discretion to grant or deny a continuance and we will not set aside its decision absent a showing of that discretion. The late disclosure of the health screening sheet which revealed that [Petitioner] told the booking officer that he had a history of alcohol abuse does not entitle [Petitioner] to a continuance. [Petitioner] knew he had a history of alcohol abuse and provided this information to the booking officer. He was arrested with a B.A.C. of .17 and knew he had been booked for driving while intoxicated. The facts surrounding his alcoholism were known to [Petitioner] and he could have investigated involuntariness based on this knowledge. Likewise, [Petitioner] knew of his psychiatric history and could have investigated involuntariness as a result of depression without having the health screening sheet in his possession.

> Further, a deficient mental condition, such as depression, does not by itself render a confession involuntary, because there is no constitutional right to confess only when totally rational and properly motivated. . . .

(Resp. Ex. 15 at 4.) (Alterations added; interim quotations omitted.) The appellate court next found Petitioner's second claim to be without merit.

> Viewed in the light most favorable to the trial court's denial of the motion to suppress, the facts surrounding [Petitioner's] statements to Detectives Wilson and Blankenship are as follows: [Petitioner] was arrested early in the morning at the scene of the crime for driving while intoxicated and the Miranda rights were read to him at that time. [Petitioner] indicated he understood those rights. At the police station, when he was booked, [Petitioner] again received Miranda warnings and again indicated he understood them. An hour or so later, between 3:00 and 4:00 a.m., [Petitioner] was interviewed by Detectives Curtis and Simcox. Detective Curtis read the Miranda rights to [Petitioner] again. [Petitioner] wrote his initials after each Miranda right on the form provided by Detective Curtis, and indicated verbally that he understood the rights but wished to make a statement. [Petitioner] made a taped statement during this interview. Prior to making the tape, [Petitioner] was again advised of his Miranda rights. Sometime later in the

early morning, Detective Wilson asked [Petitioner] what happened and [Petitioner] gave a statement. After the police received the autopsy results, around 5:00 p.m., Detectives Wilson and Blankenship interviewed [Petitioner]. Detective Wilson asked [Petitioner] if he remembered his <u>Miranda</u> rights and [Petitioner] indicated that he understood his rights but he wanted to cooperate with the investigation.

Detective Wilson informed [Petitioner] that Evelyn's injuries were not consistent with falling out of the truck, and asked [Petitioner] if he had an explanation for them. [Petitioner's] demeanor changed, he became nervous and began crying. Detective Wilson asked [Petitioner] if he had struck his wife and [Petitioner] confessed to striking her in the truck. [Petitioner] also admitted to striking her with some kind of object he found on the ground after he located her.

(<u>Id.</u> at 5-6.) (Alterations added.)

Addressing Petitioner's third, jury-instruction claim, the appellate court found no plain error. (<u>Id.</u> at 8-9.) The court noted that the defense was that Mrs. Gerding died as a result of falling out of the truck, and was not beaten, and that the trial court should not interfere with trial strategy. (<u>Id.</u>) The court also found no error in the trial court's denial of Petitioner's motion to sever. (<u>Id.</u> at 9-11.) First, joinder was proper because Petitioner "killed his wife in a quarrel that began while he was driving while intoxicated." (<u>Id.</u> at 9-10.) Second, severance was not required because "the number of offenses was small, the evidence for each crime was simple and distinct, and there was little likelihood that the jury would have difficulty distinguishing the evidence and applying it to each offense without confusion." (<u>Id.</u> at 10.) Nor did Petitioner make a "particularized showing of substantial prejudice." (<u>Id.</u>) The court declined to reach the merits of Petitioner's fifth claim because the autopsy photograph had not been filed with the record on appeal;

consequently, the point was not preserved for review. (Id. at 11.) Had the photograph been filed, the case of State v. Rousan, 961 S.W.2d 831, 844 (Mo. 1998) (en banc) (holding that photographs are relevant if they, inter alia, show the identify of the victim and are not to be excluded because other evidence described what was shown in the photograph or because it is inflammatory) ("Insofar as photographs tend to be shocking or gruesome, it is almost always because the crime is shocking or gruesome."), would have favored its admission.

Addressing Petitioner's sixth, and final, claim, the court found that it had not been preserved for review

because no timely objection was made to the prosecutor's statement about Dr. Case's testimony at the time the prosecutor made the remark. The only objection was to the question which did not contain that statement. . . . In this case, the objection to the prosecutor's conduct, made after the witness had completed his testimony and a subsequent break for lunch, was not timely. Here the defense counsel was the first to speak about what was contained in the evidence in the jury's hearing. The prosecutor responded. Had the objection to the prosecutors colloquy been timely made, the parties could have approached the bench so that the discussions could have ben held outside the jury's hearing and the trial court could have timely admonished the jurors to disregard all attorney statements. Instead both counsel argued in the jury's hearing and the jury twice heard defense counsel say there was no evidence of kicking and once heard the prosecutor say Dr. Case testified to kicking. Defense counsel may have elected not to object or not to suggest a bench conference for a strategic reason, that is to respond with his recall of the facts in the jury's hearing.

(Id. at 13-14.)  (Alteration added; interim citation omitted.)

Petitioner filed a timely motion for post-conviction relief, which was amended by appointed counsel and denied following an evidentiary hearing. (Resp. Ex. 16 at 6-69, 89-

98, 122-28.)  Petitioner appealed on one ground: trial counsel was ineffective for failing to object to testimony by Detective Wilson about how an innocent person would respond in interrogation.  (Resp. Ex. 17.)  His appeal was denied.  (Resp. Ex. 19.)

Petitioner now seeks federal habeas relief on eight grounds.  The first six grounds are those raised in his direct criminal appeal.  In his seventh ground, he argues that his trial counsel was ineffective for failing to request a lesser-included offense instruction.  In his eighth ground, he argues that his trial counsel was ineffective for failing to object to the prosecutor's misstatement of facts that were not in evidence, specifically to statements (a) questioning why a passerby, Steve Southerly, who stopped at the scene would lie when testifying that Petitioner told him, "This is my fucking wife"; (b) that Dr. Parks' certification was not recognized by other professionals; (c) that no one had testified about gravel in Mrs. Gerding's face; and (d) implying that Petitioner would have had to "come up with some other excuse" why his confession was coerced if he had agreed to be videotaped.  (Resp. Ex. 6 at 788, 827.)  Respondent argues that the first six are without merit and the last two are procedurally barred by Petitioner's failure to raise them on appeal.

### Discussion

Standard of Review.  Title 28 U.S.C. § 2254(d) mandates that a federal court "not grant habeas relief on a claim that was adjudicated on the merits in state court unless 'it resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United

States,'" **James v. Bowersox**, 187 F.3d 866, 869 (8th Cir. 1999) (quoting § 2254(d)(1)), or it "'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,'" **Evans v. Rogerson**, 223 F.3d 869, 871 (8th Cir. 2000) (quoting § 2254(d)(2)). See also **Weaver v. Bowersox**, 241 F.3d 1024, 1029 (8th Cir. 2001) ("Section 2254(d) distinguishes between two types of erroneous decisions – those of law and those of fact[.]").

The "contrary to" clause and the "unreasonable application" clause have independent meanings. **Williams v. Taylor**, 529 U.S. 362, 405 (2000). "[A] state court decision is 'contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [their] precedent.'" **Lockyer v. Andrade**, 538 U.S. 63, 73 (2003) (quoting Williams, 529 U.S. at 405-06) (alterations added). "On the other hand, a run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." **Williams**, 529 U.S. at 406 (alteration added). Thus, a state court decision that correctly identifies the controlling legal authority and, applying that authority, rejects a prisoner's claim does not fit within the "contrary to" clause although it might be contrary to a federal court's conception of how that authority ought to be applied in that particular case. **Id.**

Such a state court decision can, however, fit within the "unreasonable application" clause. **Id.** at 407-08. "[W]hen a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case, a federal court applying § 2254(d)(1) may conclude that the state-court decision falls within that provision's 'unreasonable application' clause." **Id.** at 409 (alterations added). "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." **Id.** (alteration added). When making this inquiry, a federal habeas court should note that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." **Id.** at 410. "It is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous." **Lockyer**, 538 U.S. at 75 (internal quotations omitted). And, "'[t]o the extent that inferior federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness . . . of the state court's treatment of the contested issue.'" **Copeland v. Washington**, 232 F.3d 969, 974 (8th Cir. 2000) (quoting Long v. Humphrey, 184 F.3d 758, 761 (8th Cir. 1999)) (alterations in original). Additionally, "the [state courts'] 'summary nature' of the discussion of [a] federal constitutional question does not preclude application of the AEDPA standard." **Brown v. Luebbers**, 371 F.3d 458, 462 (8th Cir. 2004) (alterations added).

Denial of Continuance. Petitioner first argues that his constitutional rights were violated when the trial court denied his request for a continuance.

"The Supreme Court has recognized '[t]rial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons.'" **Armstrong v. Kemna**, 365 F.3d 622, 627 (8th Cir. 2004) (quoting <u>Morris v. Slappy</u>, 461 U.S. 1, 11 (1983)) (alteration in original). "'To determine whether the trial court has abused its discretion [in denying a continuance], the reviewing court will consider factors including counsel's time for preparation, conduct of counsel at trial and presence of prejudice in the record.'" **McMiller v. Lockhart**, 915 F.2d 368, 372 (8th Cir. 1990) (quoting <u>Nerison v. Solem</u>, 715 F.2d 415, 418 (8th Cir. 1983)) (alteration added).

After considering these relevant factors, the Eighth Circuit Court of Appeals concluded in **Armstrong**, 365 F.3d at 626, that the AEDPA's standards for habeas relief had not been met by a petitioner who alleged he was denied due process by the trial court's refusal to grant him a continuance to secure the presence of out-of-state witnesses whose potential testimony petitioner did not explain and whose availability for trial was not disclosed. <u>See</u> <u>also</u> **Kinder v. Bowersox**, 272 F.3d 532, 542 (8th Cir. 2001) (concluding that habeas petitioner had failed to satisfy AEDPA standard on claim that he was denied due process when the trial court refused him a continuance to obtain an expert witness of his choosing to testify about his mental capacity; Missouri Supreme Court had determined that petitioner had failed to demonstrate prejudice and his conclusory statement to the opposite was insufficient to rebut presumption of correctness attached to Supreme Court's

determination); **McMiller**, 915 F.2d at 372 (finding no prejudice from denial of continuance; counsel's conduct at trial was constitutionally adequate and petitioner had failed to show any prejudice from performance).

In the instant case, Petitioner has also failed to show any prejudice from the denial of a continuance. The basis for the request for a continuance was the ability to pursue the issue of Petitioner's mental capacity at the time of his statements. The information he argued was untimely provided his counsel was information that was within his earlier reach. It was information he would have provided to the jail personnel, e.g., information about his past treatment for alcohol abuse, and, consequently, he would have been aware of it prior to the prosecutor's disclosure. The trial court's denial of the request did not violate Petitioner's constitutional rights.

Motion to Suppress Statements. Petitioner next argues that his constitutional rights were violated when the trial court denied Petitioner's motion to suppress his inculpatory statements.

As noted by the Missouri Court of Appeals when discussing Petitioner's continuance claim, "[t]here is no constitutional right for 'a criminal defendant to confess to his crime only when totally rational and properly motivated.'" **Lyons v. Luebbers**, 403 F.3d 585, 597 (8th Cir. 2005) (quoting Colorado v. Connelly, 479 U.S. 157, 166 (1986)) (alteration added). The habeas petitioner in **Lyons** had confessed after thrice being advised of his Miranda rights. **Id.** Within a four-hour period, Petitioner was thrice advised of his Miranda rights. Approximately thirteen hours later, he was asked if he remembered those

rights. He replied that he did. He then made his statement. As in **Lyons**, there is no showing that he did not understand those rights. **Id.** at 596. See also **United States v. Junkman**, 160 F.3d 1191, 1194 (8th Cir. 1998) (rejecting defendant's claim that confession was coerced because he gave it after being awakened by police from a methamphetamine-induced sleep; officer had testified that defendant's eyes were red but did not appear intoxicated, inhibited, or disoriented and defendant had stated to officer that he understood his Miranda rights); **United States v. Turner**, 157 F.3d 552, 556 (8th Cir. 1998) (holding that even if defendant was intoxicated at time of confession, the evidence showed he understood his rights and knowingly waived them before confessing).

Petitioner further argues, however, that his statements were caused by his weakened mental and physical condition and by the officers' trickery and pressure tactics. "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." **Colorado**, 479 U.S. at 522 (alteration added). Thus, "personal characteristics of the defendant are constitutionally irrelevant absent proof of coercion brought to bear on the defendant by the State." **Sidebottom v. Delo**, 46 F.3d 744, 758 (8th Cir. 1995) (interim quotations omitted). See also **United States v. Klein**, 13 F.3d 1182, 1184 n.2 (8th Cir. 1994) (rejecting defendant's claim that confession should be suppressed because he was severally intoxicated when there was no evidence of police coercion).

At the hearing on Petitioner's motion to suppress, Officer Wilson testified that he raised his voice, told Petitioner that the autopsy results were inconsistent with Petitioner's

description of what had happened, and asked him what he would say if Wilson told him that someone had seen him hit his wife. "It goes without saying that the interrogation of a suspect will involve some pressure. The very purpose is to elicit a confession." **Sheets v. Butera**, 389 F.3d 772, 779 (8th Cir. 2004). See also **Battle v. Delo**, 19 F.3d 1547, 1563 (8th Cir. 1994) (finding no coercive police activity when defendant confessed after being told by officer that he did not believe him); **Jenner v. Smith**, 982 F.2d 329, 334 (8th Cir. 1993) (finding no coercive police activity when defendant was informed that her polygraph test results indicated deception).

Wilson testified he raised his voice at times when questioning Petitioner. This too is not coercive. See **Id.** (noting that "[n]umerous cases have held that questioning tactics such as a raised voice" will not alone render a confession involuntary) (alteration added). Moreover, "even though the police use overreaching tactics such as the use of threats or violence, or the use of direct or indirect promises, such promises or threats will not render the confession involuntary unless it overcomes the defendant's free will and impairs his capacity for self-determination." **Sheets**, 389 F.3d at 778.

The state courts concluded that Petitioner's inculpatory statements were not coerced by police activity. On habeas review, this court "give[s] 'great weight to the considered conclusions of a coequal state judiciary.'" **Thatsaphone v. Weber**, 137 F.3d 1041, 1047 (8th Cir. 1998) (quoting Miller v. Fenton, 474 U.S. 104, 112 (1985)) (alteration added). These conclusions, supported by the record, are not based on an unreasonable

determination of the facts or an unreasonable application of clearly established Federal law. Petitioner's claim to the contrary is without merit.

Jury Instruction on Lesser Included Offense. Petitioner argues that the trial court should have sua sponte instructed the jury on the lesser included offense of involuntary manslaughter.

"[T]he failure to give a lesser included offense instruction in a noncapital case rarely, if ever, presents a constitutional question." **Pitts v. Lockhart**, 911 F.2d 109, 112 (8th Cir. 1990) (alteration added). Accord **Green v. Groose**, 959 F.2d 708, 709 (8th Cir. 1992) (per curiam). This is not one of the rare cases.

The relevant evidence before the jury was Dr. Case's testimony that Mrs. Gerding died from being struck with a blunt instrument, Petitioner's statements that he had so struck her, Dr. Parks' testimony that her injuries were consistent with falling from a moving motor vehicle, and Petitioner's testimony that she did so fall. The relevant statutory provision on involuntary manslaughter requires a jury to find that a person commits that crime if he "[r]ecklessly causes the death of another person[.]" Mo.Rev.Stat. § 565.024.1(1) (alterations added). Whether the jury believed Petitioner struck Mrs. Gerding as she lay on the ground or believed she died after falling from the truck, neither scenario supports a jury instruction on involuntary manslaughter. See **Tatum v. Dormire**, 183 F.3d 875, 878 (8th Cir. 1999) (rejecting constitutional challenge to trial court's failure to instruct on lesser included offense when such instruction was not supported by evidence).

Motion to Sever. Petitioner argues his motion to sever the DWI charge should have been granted. Specifically, he contents that the joinder of the DWI charge allowed the only physical evidence against him, his blood alcohol content, to be admitted.

"To obtain habeas relief for failure to sever, [Petitioner] must show that 'the failure to grant severance rendered the trial "fundamentally unfair."'" **Wharton-El v. Nix**, 38 F.3d 372, 374 (8th Cir. 1994) (quoting Hollins v. Dep't of Corrections, 969 F.2d 606, 608 (8th Cir. 1992)) (alteration added). This is a heavy burden. **Hollins**, 969 F.2d at 608. See also **Robinson v. Wyrick**, 735 F.2d 1091, 1094 (8th Cir. 1984) (noting that joinder of offenses in single trial is a matter of trial court discretion under both Missouri and federal law and noting that the decision may not normally be disturbed on review). Additionally, a cautionary instruction to the jury that they must consider each count separately, such as the one given in the instant case, see Respondent's Exhibit 9 at 75, is an indication that the failure to grant severance does not render the trial fundamentally unfair. See **Wharton-El**, 38 F.3d at 375.

Petitioner has not carried his heavy burden to establish that the joinder of offenses in a single trial was fundamentally unfair. Evidence of his intoxication was relevant to the felony charges and to his claim of a coerced confession. See **United States v. Murdock**, 928 F.2d 293, 298 (8th Cir. 1991) (finding no constitutional error in refusal to sever different robbery counts based on robberies being carried out over a short period of time and being performed with similar modus operandi).

<u>Introduction of Autopsy Photograph.</u>  In his fifth ground for habeas relief, Petitioner argues that his due process rights were violated when the trial court overruled his objection to the use of an autopsy photograph by a witness to identify his wife. Respondent contends that this claim is procedurally barred by Petitioner's failure to include the photograph in the record and, alternatively, is without merit.

Because Petitioner's fifth claim "can be easily resolved in the merits," the question of his procedural default will not be reached.  <u>See</u> **Tokar v. Bowersox**, 198 F.3d 1039, 1049 (8th Cir. 1999).

"[I]n habeas corpus proceedings, it is not within [the federal courts'] province to 'reexamine state-court determinations on state-law questions.'"  **Johnston v. Luebbers**, 288 F.3d 1048, 1056 (8th Cir. 2002) (quoting <u>Estelle v. McQuire</u>, 502 U.S. 62, 67-68 (1991)) (alterations added).  <u>See also</u> **Taylor v. Bowersox**, 329 F.3d 963, 968 (8th Cir. 2003) ("A state's interpretation of its own law is virtually unreviewable by a federal court.").  Thus, "'[a] state court's evidentiary rulings can form the basis for habeas relief under the due process clause only when they were so conspicuously prejudicial or of such magnitude as to fatally infect the trial and deprive the defendant of due process.'" **Osborne v. Purkett**, 411 F.3d 911, 917 (8th Cir. 2005) (quoting <u>Parker v. Bowersox</u>, 94 F.3d 458, 460 (8th Cir. 1996)) (alteration added).  <u>Accord</u> **Rousan v. Roper**, 436 F.3d 951, 958-59 (8th Cir. 2006) (<u>Rousan II</u>); **Amrine v. Bowersox**, 238 F.3d 1023, 1032-33 (8th Cir. 2001); **Bounds v. Delo**, 151 F.3d 1116, 1119 (8th Cir. 1998).  "[T]his due process standard mandates a greater showing of prejudice than is needed to support a

finding of plain error on appeal." **Griffin v. Delo**, 33 F.3d 895, 905 (8th Cir. 1994) (alteration added). Consequently, federal habeas review of an alleged due process violation in a state court conviction is narrow. **Anderson v. Goeke**, 44 F.3d 675, 679 (8th Cir. 1995).

The Missouri Court of Appeals cited the Missouri Supreme Court case of **Rousan**, 961 S.W.2d at 844, in denying Petitioner's challenge to the use of the autopsy photograph. The defendant in that case, William Rousan, sought habeas relief on the grounds that the admission into evidence of seven photographs of the victims' bodies, recovered one year after the murders, was unfairly prejudicial. **Rousan II**, 436 F.3d at 958. The Eighth Circuit Court of Appeals denied relief, finding that the Missouri Supreme Court's conclusion that they could "'not say that the 'allegedly prejudicial impact of these photographs outweighed their probative value [or that] admission of the photographs caused the jury to act on the basis of passion, rather than reason'" "was not contrary to, nor an unreasonable application of, clearly established federal law." **Id.** at 959 (quoting Rousan, 961 S.W.2d at 845) (alteration in original).

Clearly, if the admission of seven photographs of "severely decomposed" bodies, **id.** at 958, was not unfairly prejudicial, the use of one photograph to identify the victim did not violate Petitioner's due process rights.

Prosecutorial Misconduct. Petitioner next argues that his rights to a fair trial and to due process were violated when the trial court overruled his objection to the prosecutor's

statement that Dr. Case's findings were consistent with Mrs. Gerding being kicked in the back.

"'As a general rule, prosecutorial misconduct does not merit federal habeas relief unless the misconduct infected the trial with enough unfairness to render [a] petitioner's conviction a denial of due process.'" **Stringer v. Hedgepeth**, 280 F.3d 826, 829 (8th Cir. 2002) (quoting Louisell v. Dir. of Iowa Dep't of Corrections, 178 F.3d 1019, 1023 (8th Cir. 1999)) (alteration in original). "To amount to a due process violation, improper remarks by a prosecutor must be 'so egregious that they fatally infect [ ] the proceedings and render [ ] [a defendant's] entire trial fundamentally unfair.'" **Id.** (quoting Moore v. Wyrick, 760 F.2d 884, 886 (8th Cir. 1985)) (alterations in original). "A petitioner 'must show that there is a reasonable probability that the error complained of affected the outcome of the trial – i.e., that absent the alleged impropriety the verdict probably would have been different.'" **Id.** (quoting Anderson, 44 F.3d at 679).

Dr. Case testified that Mrs. Gerding had broken ribs in her back that were consistent with her body being struck with blunt force and that she had an abrasion along the midline of her back. (Resp. Ex. 5 at 516-17.) When questioning Dr. Parks, the prosecutor asked him if being kicked in the back with a specific pair of shoes would leave a mark. (Id. at 644.) Trial counsel's objection to the question was overruled.[9] When discussing trial

<hr>

[9]The undersigned notes that the finding of the Missouri Court of Appeals that this objection was not made until after Dr. Parks had completed his testimony is not supported by the record. Trial counsel objected during the testimony; his objection was overruled; Dr. Parks answered the complained-of question. After Dr. Parks had testified, trial counsel moved for a mistrial. The motion was denied. This erroneous finding, however, does not alter the conclusion that the

counsel's motion for a mistrial on the same basis as the objection, both the prosecutor and the trial court thought Dr. Case had testified that Mrs. Gerding had been kicked in the back. Although their respective memories proved incorrect, the prosecutor's question during a four-day trial with eighteen witnesses did not affect the verdict, particularly as there was testimony that the victim had broken back ribs consistent with being struck and the reference to kicking was never repeated.

Petitioner's sixth ground is unavailing.

Ineffective Assistance of Trial Counsel.  It is undisputed that Petitioner did not raise either of his current claims of ineffective assistance of trial counsel in his appeal from the denial of his postconviction motion.

Title 28 U.S.C. § 2254(b)(1)(A) and the Supreme Court bar the granting of habeas corpus relief unless it appears that the state prisoner has exhausted available state court remedies.  See **Gray v. Netherland**, 518 U.S. 152, 161 (1996); **Coleman v. Thompson**, 501 U.S. 722, 730 (1991).  "Because 'it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation,' federal courts apply the doctrine of comity, which 'teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter.'"  **Id.** at 731 (quoting Rose v. Lundy, 455 U.S. 509, 518 (1982)).  See also **Weeks**

_____

prosecutor's statement did not deny Petitioner a fair trial or due process.

**v. Bowersox**, 119 F.3d 1342, 1349-50 (8th Cir. 1997) ("Requiring the exhaustion of state remedies both allows the states to correct any possible constitutional violations without unnecessary intrusion by the federal courts and allows the state courts to create a factual record should the matter proceed to federal court.").  "A habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance.  A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him." **Coleman**, 501 U.S. at 732.  In Missouri, claims of ineffective assistance of trial counsel must be raised in a Rule 29.15 motion and in the appeal from a denial of that motion.  Mo.S.Ct.R. 29.15.  There are strict time limits for both.  Id.  Those limits have passed; thus, Petitioner has met the technical requirement for exhaustion of his federal claims.

In order to preclude habeas petitioners from avoiding the exhaustion requirement and to "ensure that the States' interest in correcting their own mistakes is respected in all federal habeas cases," **Coleman**, 501 U.S. at 732, the state procedural bar that gives rise to a habeas petitioner having technically satisfied the exhaustion requirement provides an independent and adequate state-law ground for the petitioner's conviction, **id.** at 730.  Consequently, Petitioner's failure to raise his instant claims of ineffective assistance of trial counsel in his appeal from the denial of his Rule 29.15 motion results in those claims being procedurally barred.  See **Interiano v. Dormire**, 471 F.3d 854, 856 (8th Cir. 2006); **Osborne**, 411 F.3d at 919.  This procedural bar prevents federal habeas review of

Petitioner's ineffective assistance of trial counsel claims unless he can show cause and prejudice for his default. See **Gray**, 518 U.S. at 162; **Coleman**, 501 U.S. at 748.

"'[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rules.'" **Preston v. Delo**, 194 F.3d 908, 915 (8th Cir. 1999) (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)) (alteration in original). There is no exhaustive catalog of the objective impediments nor have the precise contours of the cause requirement been clearly defined. **Ivy v. Caspari**, 173 F.3d 1136, 1140 (8th Cir. 1999). "At a minimum, however, [Petitioner] must show that 'something external to [him], something that cannot fairly be attributed to him,' caused the procedural default." **Id.** (quoting Coleman, 501 U.S. at 753) (first alteration added, second in original). Petitioner does not advance any cause for his default. Indeed, he does not dispute in his traverse Respondent's argument that the last two claims are procedurally defaulted. It is, therefore, unnecessary to consider whether he has demonstrated prejudice. See **Lee v. Kemna**, 213 F.3d 1037, 1039 (8th Cir. 2000); **Abdullah v. Groose**, 75 F.3d 408, 413 (8th Cir. 1996).

Petitioner's ineffective assistance of trial counsel claims may, however, still be reached on their merits if Petitioner establishes that a failure to do so will result in a fundamental miscarriage of justice. See **Moore-El v. Luebbers**, 446 F.3d 890, 896 (8th Cir. 2006); **Weaver v. Bowersox**, 438 F.3d 832, 838 (8th Cir. 2006). The fundamental miscarriage of justice exception is applicable when a petitioner makes a showing, based

on new evidence, that a "'constitutional violation has probably resulted in the conviction of one who is actually innocent.'" **Osborne**, 411 F.3d at 920 (quoting <u>Murray</u>, 477 U.S. at 496). Petitioner does not allege that this exception applies to his defaulted claims.

## Conclusion

For the foregoing reasons, the Missouri state courts' resolution of Petitioner's first six § 2254 claims is not contrary to clearly established Federal Law, is not an unreasonable application of such law, and is not an unreasonable determination of the facts. Petitioner's last two claims are procedurally defaulted. Consequently, these claims too are unavailing. Accordingly,

**IT IS HEREBY ORDERED** that Jeremiah W. Nixon is hereby added as a Respondent.

**IT IS HEREBY RECOMMENDED** that the 28 U.S.C. § 2254 petition of James F. Gerding be **DENIED** without further proceedings.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact. See **Griffini v. Mitchell**, 31 F.3d 690, 692 (8th Cir. 1994).


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 29th day of June, 2007.